IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| AIMEE L. WILCOX, individually,<br><br>Plaintiff,<br><br>v.<br><br>CAREER STEP, LLC, a Utah limited liability company, et al.,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Case No.  2:08-cv-0998<br><br>Judge Clark Waddoups |

## I.      INTRODUCTION

The court heard oral argument on Defendant Career Step's Motion for Partial Summary Judgment [Dkt. No. 174] on February 5, 2013 and took the parties' positions as argued during the hearing under advisement. The court has also carefully reviewed the parties' submissions in support of and opposition to Defendant's motion—as well as the Development Agreement (the "Agreement") at the heart of this lawsuit [Dkt. No. 175-1]—and finds that, as a threshold matter, the statute of limitations bars Plaintiff's claim of fraud in the inducement in entering into the Agreement. The Agreement is therefore enforceable, and the court will enforce it under governing principles of Utah law. The Agreement provides that Defendant jointly owns the copyright at issue in this dispute. Accordingly, Plaintiff's claims for copyright infringement fail as a matter of law. And as discussed below, the court also grants Defendant's motion on Plaintiff's accounting and intentional interference with prospective economic relations claims, but denies the motion as to Plaintiff's abuse of personal identity claim.

## II.      BACKGROUND

The court has discussed the primary facts underlying Plaintiff's claims in its Order and Memorandum Decision dated February 19, 2010 dismissing Plaintiff's unjust enrichment and unfair competition claims [Dkt. No. 97] and refers here to that discussion for a general review of the background. In short, for purposes of this motion, Plaintiff argues that a genuine dispute of material fact exists as to whether she was fraudulently induced (through fraudulent actions including coercion) into signing the Agreement on July 23, 2003. If true, this would also cast a shadow over the ownership of the copyright at issue in the Agreement. She also claims that a genuine dispute of material fact exists about whether Defendant intentionally interfered with her prospective economic relations when she tried to interest a fellow member of her church congregation in doing business with her. Finally, she presents facts showing that Defendant's liability for abuse of her personal identity—by continuing to use marketing materials prepared by Plaintiff or referring to her or using her image—is genuinely in dispute.

### A.      Oral Agreement and Fraudulent Inducement or Coercion

Plaintiff argues that she entered into an oral agreement with Defendant in July of 2002 pursuant to which she spent "thousands of hours preparing the medical coding Course" that eventually became the "Curriculum" at the center of the Development Agreement. (Pl.'s Opp. Mot. Part. Summ. J., xi ¶¶ 11.a-11.p [Dkt. No. 232].) Under this oral agreement, Plaintiff believed she would receive a 5% gross royalty from Defendant's use and sale of the course and a $10,000 completion bonus,[1] that she would be hired by Defendant to provide student support services, and that she would be the sole owner of the copyright to the course, which she also believed would stay in her family upon her death. (*Id.* at xii ¶ 11.b.) Plaintiff claims she relied on the terms of this alleged oral agreement "in spending an entire year, or more, creating the

---

[1] Both of which she was also entitled to under the Agreement.

Course." (*Id.* at xiii ¶ 11.e.) Defendant then allegedly "leveraged the thousands of hours of time and effort Mrs. Wilcox spent in preparing the Course to string out payments and coerce her into signing away the underlying copyright in the Course when she had completed the Course and was near financial ruin." (*Id.* at xiv ¶ 11.h.) According to Plaintiff, Defendant's presentation of the written Agreement as a "take it or leave it" offer after Plaintiff had already invested her time and effort into creating the Course at her own expense unlawfully caused her to "assign away her copyright under extreme duress." (*Id.* ¶ 11.i.) Moreover, she did not understand the terms of the Agreement.[2] And Plaintiff quotes Defendant's CEO at the time, Andrea Anaya, as having said in her deposition that "[i]t was never our intention to pay her to develop the course." (*Id.* at xv ¶ 11.n.)[3]

On July 23, 2003, Plaintiff signed the Agreement, which she claims "contained numerous terms, conditions, and responsibilities to be undertaken by [Plaintiff] that had not been previously discussed or negotiated by the parties." (*Id.* at xxi ¶ 25.)[4] At a meeting on or about March 25, 2003, Plaintiff for the first time saw the "final [Agreement] as provided to her by Mr. Dunn with terms significantly different from those discussed during the negotiations with Mrs. Anaya." (*Id.* at xxii ¶ 26.) But eventually, after reading the entire Agreement (*id.* at xx ¶ 21), she voluntarily (*id.* at xvi ¶ 12), though "reluctantly," signed it anyway (*id.* at xviii ¶ 16; xxii ¶ 25).

---

[2] She "did not understand the implications of joint copyright as written in the [Agreement] versus sole copyright as agreed-to under the oral agreement." (Id. at xv ¶ 11.l.) She "did not understand that under the [Agreement], Career Step could claim to terminate the agreement and stop paying royalties, while continuing to sell the Course in perpetuity under the guise of being a joint copyright owner." (*Id.* ¶ 11.m.)

[3] Defendant points out in its Reply brief that this quote is selective and misrepresents Mrs. Anaya's testimony, which begins with the following statement from Mrs. Anaya: "Q: Was it Career Step's intention to pay [Plaintiff] in accordance with the development agreement? A: Absolutely." And, in the sentence immediately following the quote provided by Plaintiff, Mrs. Anaya testified that "[Plaintiff] was supposed to develop the course on her own time and at her own expense, and then she would receive a royalty because of that." (Def.'s Reply Mot. Part. Summ. J., 7 [Dkt. No. 239].)

[4] "Only after she had completed the Course and delivered it to Career Step did they change the material terms of the agreement." (Pl.'s Opp. Mot. Part. Summ. J., 10 [Dkt. No. 232].) Plaintiff does not dispute, however, that "Career Step made changes to the Development Agreement at Plaintiff's request before signing it in July 2003." (*Id.* at xxi ¶ 25.)

Additionally, she testified in her deposition that the royalty of 5% of gross revenue was "more or less fair," though she claims in her Opposition that due to the alleged duress, she felt that "she had no other choice" but to accept that rate. (*Id.* at xxiii ¶¶ 28-29.)

Plaintiff explains that "the parties had been civil, cordial, and friendly in their exchanges up until February 16, 2006." (*Id.* at xix ¶ 19.) It was not until then, alleges Plaintiff, that she realized that "Career Step never intended to pay her the royalties she was entitled to." (*Id.* ¶ 18.) Defendant's last royalty payment—which Plaintiff alleges was incomplete—was in mid-March 2006, after which Defendant declared Plaintiff in breach of the Agreement and stopped paying her royalties. (*Id.* ¶ 19.) Plaintiff then filed this lawsuit on December 30, 2008. (*Id.* at xx ¶ 20.)

The Agreement contains an integration clause that provides, in relevant part, as follows: "This Agreement contains the entire agreement of the parties and there are no other promises or conditions in any other agreement whether oral or written. This Agreement supersedes any prior written or oral agreements between the parties." (Agreement at § 17 [Dkt. No. 175-1].) Moreover, the Agreement provides for the joint ownership of the copyright to the "Curriculum" as defined in section 2 of the Agreement:

> The copyright to the Curriculum, as the Curriculum may be revised and updated from time to time by Wilcox (the "Copyright"), shall be jointly held in the names of Career Step and Wilcox. Nothing in this Agreement shall, however, affect any independent rights Career Step may have to the copyright of materials previously developed by Career Step and provided for the use of Wilcox in developing the Curriculum under Sections 2.1.4 and 2.1.5 ("Career Step Materials"). Wilcox agrees that she will not use any Career Step Materials for any purpose, other than incorporation of such materials in the Curriculum, without the prior written consent of Career Step, with the limited exceptions set forth in Articles 5 and 6. The Parties recognize that the Curriculum, as to which Wilcox holds a joint copyright, includes only the substantive content of the training materials, and does not include any part of the online delivery mechanism for the content, including but not limited to the technology that enables the content to be viewed, manipulated, graded, stored, and otherwise interacted with online (the "Online Technology Platform"). Nothing in this Agreement shall affect the sole right of Career Step to the copyrights or other intellectual property rights for the Online

Technology Platform. The Parties agree to take all actions necessary to perfect and enforce their joint rights in the Copyright. (Agreement at § 7 [Dkt. No. 175-1].)

The Agreement also provides that a number of its key provisions shall survive termination of the Agreement, including section 12 relating to assignment of the copyright and rights to royalties and section 14 relating to licensing of copyright. (Agreement at § 15 [Dkt. No. 175-1].)

**B.      Intentional Interference with Prospective Economic Relations**

After termination of the Agreement in 2006, Plaintiff alleges she was "seriously exploring business opportunities" with Robert Oldham, a man from her local church congregation, relating to Plaintiff's "copyrighted course." (Pl.'s Opp. Mot. Part. Summ. J., xxv ¶ 31 [Dkt. No. 232].) Plaintiff does not dispute that "no written agreement evidencing an actual or potential business relationship between Robert Oldham and Plaintiff exists." (*Id.* at xxiv ¶ 31.) Instead, she points to Mr. Oldham's deposition testimony in which he said that he believed "that there was an oral agreement reached" to "continue negotiations of potentially working together." (*Id.* at xxv ¶ 33.) Plaintiff contends that Mrs. Anaya made comments to Mr. Oldham that dissuaded him from further pursuing any potential business relationship with Plaintiff at that time. (*Id.* at xxx-xxxi ¶¶ 49-50.)

**C.      Abuse of Personal Identity**

During her contractual relationship with Defendant, Plaintiff prepared an audio CD recording of an introductory letter and the introductory letter itself, both of which were created for Defendant's use in marketing the course that Plaintiff had developed pursuant to the Agreement. Plaintiff alleges that she "revoked her authorization for Career Step to use the Letter and the Audio CD after their professional relationship was terminated." (*Id.* at xxxiv ¶ 57.) As evidence that Defendant knew that Plaintiff had withdrawn her authorization for Defendant to use these materials, Plaintiff provides internal correspondence dated August 4, 2008 from within

5

Career Step in which Mrs. Anaya is told that "[y]ou do not want to know that [Plaintiff's] Hello Friend and [Plaintiff's] CD are still going out in the first mailer packet, so I won't tell you." (*Id.* at xxxv ¶ 61, Email dated Aug. 4, 2008 attached as Exhibit Z [Dkt. No. 233-16].)

## III.   DISCUSSION

### A.   Summary Judgment Standard

As "an integral part of the Federal Rules as a whole," the mechanism of summary judgment has long provided courts a means by which "factually insufficient claims or defenses could be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). With this focus, Rule 56(a) requires the court to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(a) (2012). And this standard similarly requires the court to enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element to prove that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 323. Thus, the long prevailing standard for summary judgment—firmly established in Supreme Court precedent—has been that the moving party must first establish the absence of a genuine issue of material fact on the claims or elements as to which it is moving for summary judgment. *Celotex*, 477 U.S. at 323; *Kannady v. City of Kiowa*, 590 F.3d 1161, 1168-1169 (10th Cir. 2010) ("The moving party has both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law.") (internal quotation marks removed).

It is also well established in Supreme Court and Tenth Circuit precedent that if "a properly supported motion for summary judgment is made, the adverse party 'must set forth

specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (quoting the pre-2010 version of Rule 56(e));[5] *see also*, *e.g.*, *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010) ("in response to a properly supported motion for summary judgment, a non-movant must produce sufficient evidence for a reasonable trier of fact to find in its favor at trial on the claim or defense under consideration"). But "[b]y its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247-48 (emphasis in original). "'[T]he movant need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim.'" *Kannady*, 590 F.3d at 1169 (quoting *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)).

In sum, now as before the 2010 amendments to Rule 56, the court must perform "the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. "When applying this standard, we examine the factual record in the light most favorable to the party opposing summary judgment." *Kannady*, 590 F.3d at 1168 (quoting *Belhomme v. Widnall*, 127 F.3d 1214, 1216 (10th Cir. 1997)). Exercising this gatekeeping function, the court finds no genuine issue of material fact as to any of the claims that are the basis of Defendant's Motion for Partial Summary Judgment except Plaintiff's claim for abuse of personal identity. Because

---

[5] Rule 56 of the Federal Rules of Civil Procedure was amended in 2010 and no longer refers directly to the adverse party's burden to "set out specific facts showing a genuine issue for trial" as expressed in former Rule 56(e)(2). Rather, the new Rule 56(c) now outlines procedures governing the provision of facts either in support of or opposition to the motion for summary judgment from which this same standard can be inferred, particularly in light of prior, well established Supreme Court precedent such as *Celotex* and *Anderson*.

Defendant is also entitled to judgment as a matter of law on each of these claims (other than the claim for abuse of identity), the court grants Defendant's motion as to those claims.

## B.    Statute of Limitations

Conscious of its duty to "[e]xamine the factual record in the light most favorable" to Plaintiff as the "party opposing summary judgment," *Kannady*, 590 F.3d at 1168, the court finds no genuine dispute of material fact surrounding the execution of the Agreement to the extent relevant to the statute of limitations inquiry. A three year statute of limitations governs Plaintiff's claim that she was fraudulently induced into signing the Agreement. Utah Code Ann. § 78B-2-305(3) (2012) (providing that an action may be brought within three years "for relief on the ground of fraud or mistake; except that the cause of action does not accrue until the discovery by the aggrieved party of the facts constituting the fraud or mistake"). Plaintiff does not dispute that this is the relevant statute of limitations. (Pl.'s Opp. Mot. Part. Summ. J., 7 [Dkt. No. 232].) Nor can Plaintiff take refuge in the shelter provided by the "discovery rule" alluded to within the statute itself: "Discovery by the aggrieved party of the facts constituting an alleged fraud is measured 'from the time the fraud was actually known or could have been discovered through the exercise of reasonable diligence.'" *Booth v. Attorney's Title Guaranty Fund, Inc.*, 2001 UT 13, ¶ 43, 20 P.3d 319 (quoting *Baldwin v. Burton*, 850 P.2d 1188, 1196 (Utah 1993)); *see also Cox v. Aurora Loan Services LLC*, No. 1:10-cv-00159-DAK, 2011 U.S. Dist. LEXIS 973 at *5 (D. Utah Jan. 5, 2011) (same). "This means that if a party has the opportunity to know the facts constituting an alleged fraud, that party cannot remain inactive and then later allege a want of knowledge as a result of his own negligence." *Booth*, 2001 UT at ¶ 43.

Plaintiff admits that she read the entire Agreement before she signed it on July 23, 2003. (Pl.'s Opp. Mot. Part. Summ. J., xx ¶ 21 [Dkt. No. 232].) This followed consulting (albeit

briefly) with an attorney who was a personal friend about the draft Agreement,[6] and then months

of discussions and negotiations lasting from at least March 2003 until the date of signing. (*Id.* at

xxii ¶ 26.) Specifically, Plaintiff does not dispute that she and her husband met with

representatives of Defendant to discuss the terms of the Agreement on March 25, 2003 and that it

was at this meeting that she first saw the final draft Agreement and noticed that it contained

"terms significantly different from those discussed during the negotiations with Mrs. Anaya."

(*Id.*) Although Defendant "made a few minor changes" to the Agreement based on Plaintiff's

comments, by the time Plaintiff reviewed it on the date of signing and signed it, she knew that in

her view the Agreement "contained numerous terms, conditions, and responsibilities to be

undertaken by [Plaintiff] that had not been previously discussed or negotiated by the parties."

(*Id.* at xxi ¶ 25; Pl.'s Am. Verif. Compl. ¶¶ 76-81 [Dkt. No. 95].) In fact, Plaintiff has

specifically averred[7] in her Complaint that after reviewing the Agreement but prior to signing it,

she complained to Defendant about what she viewed as new and different terms that had not

been previously discussed or negotiated between the parties during months of prior discussions

and negotiations. (Pl.'s Am. Verif. Compl. ¶ 78 [Dkt. No. 95].) Despite knowing of these terms

---

[6] At the beginning of this months-long period of discussion and negotiation about the draft Agreement, Plaintiff sent Defendant an email on March 19, 2003 stating in relevant part that "[o]ur attorney is reviewing the contract and drawing up some suggestions that we can discuss later." (Pl.'s Opp. Mot. Part. Summ. J., xxi ¶ 23 [Dkt. No. 232].) Plaintiff explained in her Opposition, however, that despite her statement in the email, she had never actually engaged an attorney and had only spoken to her personal friend "regarding certain terms in the proposed DA" and that "I do not remember him reviewing it in its entirety." (*Id.*) It appears, therefore, that she at least wanted it to appear to Defendant as though "her attorney" were reviewing the document and providing comments.

[7] As Plaintiff notes—though with misplaced reference to an overruled Second Circuit case (*see id.* at 3, n.4)—"[a] district court may treat a verified complaint as an affidavit for purposes of summary judgment if it satisfies the standards for affidavits" outlined in Rule 56. *Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003, 1019 (10th Cir. 2002) (internal quotation marks omitted). However, "a district court need not treat a verified complaint as an affidavit if 'the allegations contained in the pleading are merely conclusory.'" *Id.* (quoting *Conaway v. Smith*, 853 F.2d 789, 793 (10th Cir. 1988)). It must also be evident from the verified complaint that the signer had personal knowledge of the facts asserted and foundation for admissibility must be established. The paragraphs of the Complaint relevant to this inquiry (though perhaps not all other paragraphs in the Complaint) qualify for such treatment because the allegations about Plaintiff's understanding of the existence of new and different terms in the draft Agreement that had neither been discussed nor negotiated during previous months of discussions and negotiations about the Agreement are "made on personal knowledge," contain statements by Plaintiff that "would be admissible in evidence," and "show affirmatively that the affiant is competent to testify to the matters stated therein." *Id.* (quoting the pre-2010-amendment Rule 56(e)).

that she viewed as changes from previous discussions and negotiations, and although she complained about them to Defendant, Plaintiff nevertheless voluntarily, though "reluctantly," signed the Agreement. (Pl.'s Opp. Mot. Part. Summ. J., xvi ¶ 12; xxii ¶ 25 [Dkt. No. 232]; Pl.'s Am. Verif. Compl. ¶ 81 [Dkt. No. 95]).)

Plaintiff's own narrative, based on her allegations in the Amended Verified Complaint— which she requests the court to treat as her sworn affidavit or declaration for summary judgment purposes—and her factual assertions in response to Defendant's Statement of Undisputed Facts, leave no genuine dispute of material fact as to her knowledge, or her ability to know through the exercise of reasonable diligence, of the facts supporting her claim for fraudulent inducement at the time of signing the Agreement.[8] Additionally, the case Plaintiff cites in support of her resort to the discovery rule as a shield from the application of the statute of limitations works against her. (Pl.'s Opp. Mot. Part. Summ. J., 8 [Dkt. No. 232] (citing *Cox*, 2011 U.S. Dist. LEXIS 973).)

In *Cox*, "the alleged fraudulent inducement was the inclusion of the prepayment penalties in the documents at the loan closing" and so the plaintiffs claimed that "the fraud was contained in the terms of the contract that they signed at the closing." 2011 U.S. Dist. LEXIS 973 at *5. Signing was in 2006 and the *Cox* plaintiffs filed their complaint in 2010. *Id.* The complaint included allegations that plaintiffs "were surprised at the closing with the prepayment penalty." *Id.* Judge Kimball held that "[t]his allegation demonstrates that Plaintiffs were aware of the allegedly fraudulent conduct at the time of the closing" and that the fraudulent inducement claim was barred by the statute of limitations. *Id.* This directly supports Defendant's legal argument on very similar undisputed material facts and forecloses Plaintiff's ability to rely on the discovery rule. Thus, in this case, the statute of limitations began running on July 23, 2003, and Plaintiff's

---

[8] Plaintiff's allegations in support of her fraudulent inducement claim that Defendant never intended to pay her a 5% royalty or that royalties that were paid were deficient are misplaced. The extent to which Defendant may have been deficient in paying royalties is relevant to Plaintiff's breach of contract claim.

claim for fraudulent inducement became time barred on July 24, 2006. Defendant is therefore entitled to judgment as a matter of law on Plaintiff's fraudulent inducement claim.[9]

## C.    Coercion

Plaintiff's allegations of coercion, which form part of Plaintiff's basis for pleading a claim for fraudulent inducement, are unavailing.[10] Plaintiff claims that she had been "led to believe that she had no bargaining position" because she "had already spent all the time, energy, effort, creativity, and money creating the Course, and was now left with 'no reasonable alternative' but to sign the [Agreement] or forfeit any chance of income in exchange for her work over the prior year" (Pl.'s Opp. Mot. Part. Summ. J., 15 [Dkt. No. 232].) Plaintiff relies on a 1979 case for the proposition that "the test for a finding of duress is whether the appellant 'was in fact coerced to sign a contract by wrongful acts or threats.'" (*Id.* (quoting *Avco Financial Services, Inc.*, 596 P.2d 658, 660 (Utah 1979).) But in *Avco*, the economic duress or coercion consisted of initiating a fraud action against the appellant knowing that the litigation would jeopardize a corporate refinancing that appellant was undertaking, thereby placing appellant under duress to agree to a more favorable settlement agreement than one that had previously been negotiated. Plaintiff argues that the statement by Defendant's then CEO, Andrea Anaya, that Plaintiff could either "take it or leave it" with reference to the Agreement created a similar situation of economic duress because she had already spent "thousands of hours" developing the course. (*See, e.g.*, *id.* at xxii ¶ 25.)

---

[9] Though based on this finding the court need not entertain Defendant's other arguments against Plaintiff's fraudulent inducement claim, the court notes that Plaintiff's fraudulent inducement claim is not pled with the requisite particularity required by the Federal Rules of Civil Procedure and would be denied independently on that basis. Moreover, even were Plaintiff to withstand the challenges under the statute of limitations, the fraud in the inducement claim would fail on the merits. Plaintiff acknowledged at oral argument that she lacked evidence, other than an alleged failure to perform, to support a claim that at the time Career Step had no intent to pay the agreed upon royalty. Absent such evidence, summary judgment is required dismissing the claim on the merits. *See, e.g.*, *Republic Group, Inc. v. Won-Door Corp.*, 883 P.2d 285, 292 (Utah App. 1994).

[10] The allegations of coercion are similarly dispatched by the application of the statute of limitations as they form part of the basis for the allegations of fraud. Nevertheless, the court addresses the coercion claim for completeness.

The court finds that the parties' dealings in this case, including the "take-it-or-leave-it" statement by Defendant's CEO, do not form the basis of a claim for economic duress or coercion that could invalidate the Agreement here (even had it been pled as an independent claim rather than as part of the scheme of fraudulent inducement). The controlling case on the law of duress or coercion is *Andreini v. Hultgren*, 860 P.2d 916 (Utah 1993) in which the Utah Supreme Court announced a transition from the "modern rule" followed since 1951 in Utah to the more "relaxed" standard described in the Restatement (Second) of Contracts §§ 175-176 (1979). *Accord Bennett v. Coors Brewing Company*, 189 F.3d 1221 (10th Cir. 1999) (applying Colorado law similarly based on the Restatement (Second) of Contracts § 175). Under the Restatement rule as adopted, "a contract may be voided 'if a party's manifestation of assent is induced by an improper threat by the other party that leaves the victim no reasonable alternative.'" *Andreini*, 860 P.2d at 921 (quoting Restatement (Second) of Contracts § 175 (1979)). "The reasonable alternative 'standard is a practical one under which account must be taken of the exigencies in which the victim finds himself.'" *Id.* at 923 (quoting Restatement (Second) of Contracts § 175 cmt. b (1979)). Though certainly representing a "greatly relaxed" standard as to what constitutes an "improper threat",[11] this rule does not implicate the circumstances in this case. In fact, the court questions whether Mrs. Anaya's statement could even be considered a "threat" at all, especially in light of the parties' previous dealings, which Plaintiff described as always having been "civil, cordial, and friendly in their exchanges up until February 16, 2006." (Pl.'s Opp. Mot. Part. Summ. J., xix ¶ 19 [Dkt. No. 232].)

---

[11] Under the old "modern rule", "[c]ourts originally restricted duress to threats involving loss of life, mayhem or imprisonment, but these restrictions have been greatly relaxed and, in order to constitute duress, the threat need only be improper." *Andreini*, 860 P.2d 923 (quoting Restatement (Second) of Contracts § 175 cmt. a (1979)). "The drafters [of the Restatement] omitted the requirement that the perpetrator's actions [the "improper threat"] 'must arouse such fear as precludes a party from exercising free will and judgment' because 'of its vagueness and impracticality.' They reasoned, 'It is enough if the threat actually induces assent . . . on the part of one who has no reasonable alternative.'" *Id.* at 921 (quoting Restatement (Second) of Contracts § 175 cmt. b (1979)).

To illustrate, in *Andreini*, the Utah Supreme Court found that the plaintiff had adduced sufficient facts to raise a jury question as to whether the plaintiff had been placed under duress such that the contract could be voided. 860 P.2d at 922. Facts sufficient to create a dispute requiring the involvement of the jury as a fact finder had also been presented as to whether the plaintiff had any reasonable alternatives under the circumstances. The plaintiff suffered from a degenerative nerve disease affecting his hands. A questionable course of dealing (a two-month delay) by his doctors had placed him in a position of needing surgical intervention with increased urgency, and he faced continued irreversible loss of function in his hands with each day that passed. *Id.* at 922-23. His doctor promised him full recovery if he consented to the operation; then, within an hour before the operation, after he had been placed in a gown, shaved, and prepared for surgery, a hospital employee presented him with a form releasing both the surgeon and hospital from liability in the case of an unfavorable outcome. This was the first time the plaintiff learned he would need to relinquish his rights in order to receive the urgently needed operation. *Id.* at 918, 922.[12]

By contrast, in this case, Defendant did not institute litigation against Plaintiff as a means to force her hand, as in *Avco*. Instead, the parties' "civil, cordial and friendly" dealings provided Plaintiff with time (between at least March 25, 2003 and July 23, 2003) to negotiate, consult with an attorney, read the entire Agreement, and sign it voluntarily. Although Defendant's CEO ultimately represented that Plaintiff could "take it or leave it" in response to Plaintiff's complaints that the Agreement, in her view, included terms that were different than those that had been previously discussed, this did not create a situation analogous to *Andreini* in which a jury could find that the Plaintiff truly had no reasonable alternative to signing the Agreement.

---

[12] "When Andreini initially refused to sign the release, Beck [one of his doctors] allegedly told him that if he did not sign, Beck was 'going to play hard ball' with him, which Andreini took to mean that defendants would not provide the corrective surgery regardless of who would pay for it." *Id.* at 923.

The facts here do not rise to the level contemplated for situations of duress or coercion in controlling law. Instead, the court finds that Plaintiff ultimately found herself presented with an "unpalatable choice" similar to that faced by the plaintiff in *Brinton v. IHC Hosps., Inc.*, 973 P.2d 956 (Utah 1998), rather than an "improper threat" that could serve as the foundation for a claim of duress or coercion. In *Brinton*, the plaintiff doctor argued that the defendant hospital had placed him under duress to sign a Terms of Probation (following complaints by patients and colleagues as to his competency) by making clear that he could either stay on suspension pending appeal or sign the contract. "Although Dr. Brinton was faced with the unpalatable choice of signing the first Terms of Probation . . . or remaining on suspension pending appeal, he has not articulated how this circumstance constituted an improper threat." *Id.* at 967. Similarly, the facts of this case seem to suggest that Plaintiff faced an "unpalatable choice" between signing on July 23, 2003 or pressing for further negotiations, which might have been uncomfortable, possibly leading to litigation. But the court finds no genuine issue of material fact either as to whether Defendant made an "improper threat" (the court finds it did not) or whether Plaintiff truly lacked any reasonable alternative under the "exigencies" in which she found herself (she had reasonable alternatives).

## D.      Copyright Infringement

### 1.      *Integration Clause*

As discussed above, Plaintiff's fraudulent inducement claim fails as a matter of law, and the Agreement is therefore enforceable. The Agreement clearly provides that Plaintiff and Defendant are joint owners of the copyright to the Curriculum. (Agreement at § 7 [Dkt. No. 175-1].) "Under the Copyright Act, no copyright infringement action lies as between joint owners of the same copyright. Each co-owner of a copyright is akin to a tenant in common and each owns a

share of an undivided whole. It follows inexorably that the co-owner of a copyright is incapable of infringing that copyright vis-a-vis his counterpart co-owner." *Warren Freedenfeld Assoc., Inc. v. McTigue*, 531 F.3d 38, 47 (1st Cir. 2008) (internal citations omitted); *Estate of Brown v. ARC Music Group, Inc.*, 830 F. Supp. 2d 501, 515 (N.D. Ill. 2011) (following *Warren* and finding that the estate of one joint author "cannot recover for copyright infringement based on a co-author's exploitation of the copyright"). Plaintiff agrees that this is the correct standard but argues that "this black letter law with respect to co-authors of copyrights is inapplicable here." (Pl.'s Opp. Mot. Part. Summ. J., 3 [Dkt. No. 232].) In doing so, Plaintiff ignores the integration clause of the Agreement.

Section 17 of the Agreement is an integration clause providing that "[t]his Agreement contains the entire agreement of the parties and there are no other promises or conditions in any other agreement whether oral or written. This Agreement supersedes any prior written or oral agreements between the parties." (Agreement at § 17 [Dkt. No. 175-1].) The integration clause triggers the parol evidence rule to exclude extrinsic evidence of intentions or beliefs about the meaning of contract provisions where, as here, the plain language in the Agreement is clear and unambiguous about the joint ownership of the copyright. *Tangren Family Trust v. Tangren*, 182 P.3d 326, 330-31 (Utah 2008); *see also Daines v. Vincent*, 190 P.3d 1269, 1279 (Utah 2008). In other words, the integration clause here specifically prevents any reference to the provisions of any previously existing written or oral agreement between the parties as a means of contradicting or aiding in the interpretation of the unambiguous plain language of the copyright provisions—or any other provision—of the Agreement.

2.    *Termination of the Agreement*

Notwithstanding Plaintiff's arguments that the Agreement is voidable due to Defendant's

fraudulent inducement/coercion, Plaintiff also contends that a breach of the Agreement by

Defendant "resulted in the termination of the Agreement and its 'co-owner' provision." (*See,*

*e.g.*, Pl.'s Opp. Mot. Part. Summ. J., 2 [Dkt. No. 232].) Essentially, Plaintiff claims that a breach

and subsequent termination of the Agreement resulted in a reversion to her of the copyright in

the Curriculum or, at the very least, "resulted in significant disputes related to the ownership

rights in the Course." (*Id.*) This ignores the survival clause of the Agreement.[13]

Section 15 of the Agreement is a survival clause providing that a number of the

Agreement's key provisions "shall remain in full force and effect after the termination of this

Agreement," including section 12 relating to assignment of the copyright and rights to royalties

and section 14 relating to licensing of copyright. (Agreement at § 15 [Dkt. No. 175-1].) As

Defendant argues, "[t]hese provisions are meaningless if Plaintiff's 'automatic transfer' theory is

correct." (Def.'s Mem. Supp. Mot. Part. Summ. J., 16 [Dkt. No. 239].) That is, "[t]here would be

no reason to specify that Sections 12 and 14 'remain in full force and effect after the termination

of the Agreement' if Career Step's ownership interest in the copyright automatically transferred

to Plaintiff upon termination of the agreement." (*Id.* at 16-17.) Moreover, "[e]ven if the

Development Agreement was silent regarding the parties' ownership rights after termination,

there is no legal basis for Plaintiff's automatic transfer theory." (*Id.*) The court agrees that this

theory would depend on Plaintiff seeking rescission of the Agreement, an equitable remedy that

---

[13] Plaintiff has also effectively pleaded—or at least argued—herself out of court on this point. In arguing against Defendant's motion for summary judgment on Plaintiff's fraudulent inducement claims, Plaintiff contended that "Defendants leveraged Mrs. Wilcox into a new arrangement that would allow the Defendants to terminate the relationship at any time on a 'claim of breach,' stop paying royalties, continue to freely market the Course, and keep all of the revenue for themselves." (Pl.'s Opp. Mot. Part. Summ. J., 10 [Dkt. No. 232].) This argument implicitly acknowledges Defendant's continued joint-ownership interest even after termination of the Agreement.

is only available in the absence of a legal remedy. *Hyde v. Provo City*, No. 2:03-cv-0120-DAK, 2004 U.S. Dist. LEXIS 10003, at *11-*15 (D. Utah May 17, 2004) (discussing Utah's election of remedies doctrine). In fact, even if Defendant were liable for a deficiency in royalty payments that constituted breach of the Agreement and justified Plaintiff's alleged termination, the "automatic reversion of rights in the event of non-payment of royalties" has been denied where a contract (like the Agreement here) does not specifically provide for such a remedy, even though in that instance as much as 74% of the royalties had not been paid. *Maldonado v. Valsyn, S.A.*, No. 06-cv-15290-RMB, 2009 U.S. Dist. LEXIS 90920, at *15 (S.D.N.Y. Sept. 23, 2009). The Agreement similarly does not provide for the reversion of sole ownership of the copyright in the Curriculum to Plaintiff in the event of termination; rather, the Agreement expressly and unambiguously provides that key provisions based on the continued joint ownership of the copyright "shall remain in full force and effect after the termination of this Agreement."

Accordingly, the court finds that Defendant is entitled, as a matter of law, to summary judgment on Plaintiff's claim for copyright infringement.

## E.      Accounting

The express, unambiguous terms of the Agreement preclude Plaintiff's claim for an equitable accounting as a matter of law. "In the event of termination of the Agreement by Wilcox, Wilcox agrees that her remedies shall be limited to claims for monetary damages against Career Step and/or its assigns or successors in interest, but that any restrictions on her use of the Curriculum shall cease, and she shall not be required to account to Career Step for profits or proceeds received through her independent use of the Curriculum." (Agreement at § 6 [Dkt. No. 175-1].)[14] Plaintiff chose to have her lawyer send Defendant a letter informing Defendant that

---

[14] The Agreement also provides that "[i]n the event of termination of the Agreement by Career Step, as a consequence of default by Wilcox, all obligations to pay further Royalties to Wilcox shall cease, and Career Step

Plaintiff considered it in breach and purporting to terminate the Agreement in the event Defendant did not timely cure this breach. (Pl.'s Opp. Mot. Part. Summ. J., x ¶ 13 [Dkt. No. 232]; Pl.'s Am. Verif. Compl. ¶¶ 141-144 [Dkt. No. 95].) Though rescission and equitable accounting might arguably have been a possibility before this, Plaintiff's decision to take this approach foreclosed this option by the Agreement's express terms: "In the event that cure is not timely made, the non-defaulting party shall have all rights available at law or in equity" but if Plaintiff chose to terminate the Agreement, she agreed "that her remedies shall be limited to claims for monetary damages." (Agreement at § 6 [Dkt. No. 175-1].)

The court therefore holds that Plaintiff's claim for an equitable accounting fails as a matter of law. Nevertheless, should the Plaintiff succeed on its remaining breach of contract claim, it seems obvious that some kind of "accounting" will necessarily be involved in calculating the damages resulting from Defendant's alleged failure to pay Plaintiff the full amount of royalties to which she was contractually entitled.

**F.    Intentional Interference with Prospective Economic Relations**

Plaintiff has not established a colorable claim for intentional interference with prospective economic relations as a matter of law. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-250. To survive summary judgment on this claim, Plaintiff must show the existence of a genuine dispute of material fact "(1) that the defendant intentionally interfered with the plaintiff's existing or potential economic relations, (2) for an improper purpose or by improper means, (3) causing injury to the plaintiff." *Leigh Furniture & Carpet Co. v. Isom*, 657 P.2d 293, 304 (Utah 1982). Plaintiffs averments, allegations, and evidentiary support provided in her pleadings and her

shall have the exclusive right to continue to market the Curriculum, without accounting to Wilcox for profits or proceeds received through its independent use of the Curriculum"—a provision that further supports the fact that the Agreement provides for continued joint ownership of the copyright after termination.

Opposition to Defendant's Motion for Partial Summary Judgment fail to clear this hurdle on each of the elements of the *Leigh Furniture* test.

As to the first element, Plaintiff has not shown a genuine dispute of material fact as to whether Defendant interfered with her prospective economic relations with Robert Oldham. Although Plaintiff claims she was "seriously exploring business opportunities" with Mr. Oldham, a man from her local church congregation, relating to Plaintiff's "copyrighted course" after her termination of the Agreement in 2006 (Pl.'s Opp. Mot. Part. Summ. J., xxv ¶ 31 [Dkt. No. 232]), she does not dispute that "no written agreement evidencing an actual or potential business relationship between Robert Oldham and Plaintiff exists." (*Id.* at xxiv ¶ 31.)[15] It is also undisputed that Mr. Oldham testified in his deposition that he believed "that there was an oral agreement reached" to "continue negotiations of potentially working together." (*Id.* at xxv ¶ 33.)[16] But Plaintiff has not provided admissible evidence[17] that Defendant interfered with any prospective economic relations between Plaintiff and Mr. Oldham, though she has pointed out how Defendant's involvement in a dispute with Plaintiff about the terms of the controlling

---

[15] No legal basis exists, therefore, to argue any interference with a present contractual relationship. *See St. Benedict's Dev. Co. v. St. Benedict's Hosp.*, 811 P.2d 194, 201 (Utah 1991) ("A party is subject to liability for an intentional interference with *present* contractual relations if he intentionally and improperly causes one of the parties not to perform the contract.") (emphasis in original).

[16] The court notes its view that an "early stage", "exploratory", "very loose" oral agreement to "continue negotiation of potentially working together" is a very tenuous basis on which to claim the existence of prospective economic relations. (*See* Def.'s Mem. Supp. Mot. Summ. J., 34 & Ex. 5 at 52:5-53:6 [Dkt. No. 175-5].) However, construing the allegations and evidence liberally and in the light most favorable to the nonmoving party, the court proceeds on the assumption that a prospective economic relationship existed between Plaintiff and Mr. Oldham.

[17] Plaintiff argues that individuals working for Defendant, namely Marvin Loflin, Celeste Royal, Eugene Anaya, Andrea Anaya, and Chris Dunn, each interfered with Plaintiff's alleged prospective economic relations with Mr. Oldham. (Pl.'s Opp. Mot. Part. Summ. J., xxviii-xxx ¶¶ 39-43 [Dkt. No. 232].) But the court agrees with Defendant's observation that "this argument is supported only by Plaintiff's inadmissible declaration testimony and excerpts from depositions that do not stand for the propositions for which they are cited." (Def.'s Reply Mot. Part. Summ. J., 24 [Dkt. No. 239].) In fact, most egregiously, Plaintiff attempts to rely on a transcript of a June 9, 2006 settlement negotiation between the parties in which Mr. Oldham apparently served as a mediator and which was recorded without Defendant's knowledge. (Pl.'s Opp. Mot. Part. Summ. J., xxviii ¶¶ 40, Ex. V [Dkt. No. 232]; Def.'s Mem. Supp. Mot. Summ. J., 13 [Dkt. No. 175].) This transcript is inadmissible hearsay, unauthenticated and therefore highly unreliable, and inadmissible settlement correspondence.

Agreement affected Mr. Oldham's views. Without more, however, Plaintiff cannot clear this element of the test.

As to the second element (and even if the facts in the record supported the conclusion that Defendant interfered with a prospective economic relationship), Plaintiff has not provided evidence sufficient to create a genuine dispute of material fact about whether Defendant had an "improper purpose" in its allegedly interfering interactions with Mr. Oldham or used any "improper means" to "interfere" with Plaintiff's relationship to Mr. Oldham. "Improper purpose is established by a showing that the actor's predominant purpose was to injure the plaintiff." *St. Benedict's Dev. Co.*, 811 P.2d at 201. And, alternatively, "[i]mproper means are present where the means used to interfere with a party's economic relations are contrary to law, such as violations of statutes, regulations, or recognized common-law rules. Improper means include violence, threats or other intimidation, deceit or misrepresentation, bribery, unfounded litigation, defamation, or disparaging falsehood." *Id.* (internal quotation marks and citations omitted).

Plaintiff contends that Mrs. Anaya made comments to Mr. Oldham that dissuaded him from further pursuing any potential business relationship with Plaintiff at that time. (Pl.'s Opp. Mot. Part. Summ. J., xxx-xxxi ¶¶ 49-50 [Dkt. No. 232].) According to Plaintiff, these statements were made with the improper purpose of "harming" Plaintiff. (*Id.* at 21.) This attempted showing, however, appears to be forced by a misrepresentation of Mr. Oldham's deposition testimony. Plaintiff argues that "Mr. Oldham admitted he 'did not feel comfortable entering into a business—into a final business negotiation' and after meeting with Mrs. Anaya, 'it was clearly evident at the time that . . . there was some intent' to harm Mrs. Wilcox." (*Id.* at 21 and xxxi ¶ 50.) But as Defendant notes in its Reply, "Mr. Oldham did not testify 'it was clearly evident at the time that . . . there was some intent' to harm Ms. Wilcox. The omitted testimony states, 'it

was clearly evident at the time that *there was some significant animosity between the parties*.'" (Def.'s Reply Mot. Part. Summ. J., 11-12 [Dkt. No. 239] (emphasis of Defendant).) In fact, further examination of the context of this statement shows that Mr. Oldham actually said that "it was clearly evident at the time that there was some significant animosity between the parties. So whether there was intent to do harm toward any party, there was some intent." (Oldham Depo., Ex. U, 78:4-7 [Dkt. No. 233-11].) Mr. Oldham then identified the "animosity" to which he was referring as that which is naturally inherent in litigation. (*Id.* at 78:11-20.)[18]

In fact, the court's specific consideration of the Oldham deposition precipitated by Plaintiff's misstatement of Mr. Oldham's testimony reveals that there can be no genuine dispute that Mr. Oldham's primary concern—and the reason he broke off tentative negotiations with Plaintiff—related to the shadow over ownership of the copyright resulting from the parties' failed relationship and the ongoing litigation. As a result of Plaintiff's attempt to buttress her argument that a genuine dispute of material fact exists as to Defendant's alleged interference with a prospective economic relationship between Plaintiff and Mr. Oldham by reliance on misquoted portions of Mr. Oldham's deposition, the court finds it necessary and helpful to cull a selection of straightforward statements from Mr. Oldham's deposition expressing clearly (a) that his concern and reason for stopping negotiations was the dispute between the parties and the resulting cloud on the title to the copyright and (b) that, in fact, the status quo (at least as of the date of Mr. Oldham's deposition on May 1, 2012) appears to be that Plaintiff can and should approach Mr. Oldham again should her dispute about ownership of the copyright be resolved. Most of the quotes below combine both (a) and (b):

---

[18] In addition, further inspection reveals that Plaintiff misquotes Mr. Oldham's testimony in the first part of her selection in ¶ 50 as well. The full statement containing the portion Plaintiff quoted is as follows: "I did not feel comfortable entering into a business, the—into a final business negotiation *that might include me in litigation. And that was a consideration*." (Id. at 76:3-6 (emphasis added to text omitted by Plaintiff).)

1. "My understanding of our oral agreement was that after she concluded her ongoing litigation with Career Step, that she would come back to me and we would continue where we had left off discussing her materials related to medical transcription or trans-coding." (Oldham Depo., Ex. U, 44:20-25 [Dkt. No. 233-11].)

2. "It was a loose agreement, obviously by the nature of the agreement. The agreement was to continue negotiations of potentially working together. After I became aware that the—that there was some contention related to the title of the materials created in part by—at least in part I should say by Mrs. Wilcox, I did not feel comfortable continuing negotiation until that title was understood and clarified.

   Further, I did not want to become a party to an ongoing litigation. So I asked the Wilcoxes to resolve their ongoing dispute. And when it was resolved and clarified and ownership was understood and they were free to continue, then I asked them to come back to me and we would continue where we had left off in negotiating a potential business relationship. . . .

   I mean that there was no time frame affixed to [the loose oral agreement]. And that Ms. Wilcox had no obligation to come back and negotiate with me. And further, that I had no obligation to enter into a formal agreement of working together. We were in the process of negotiation. We terminated our negotiating pending the resolution of the litigation that was outstanding" (*Id.* at 45:23-47:2.)

3. "I believe that I have the obligation when this case is finished, if I am able, to hear her case for renewing a business relationship." (*Id.* at 47:24-48:1.)

4. "In our negotiations, it is possible that some time periods had been discussed. Specifically relating to what I understood to be our oral agreement, as to how long that would take, neither of us knew how long that legal—the ongoing litigation would take. And therefore, we did not believe it wise to set any time period on which we would open negotiations again." (*Id.* at 53:16-23.)

5. "We had a number of distinct conversations or communications related to this potential business relationship. In the process I asked specifically about the copyright of this—of the material that was being produced by Ms. Wilcox. [The Wilcoxes] indicated in every instance that I recall that that was in dispute with Career Step and was one of the ongoing matters of the pending litigation at the time. That was specifically one of the reasons that I indicated we could not continue any negotiations until that was resolved because title to said copyrights and other interests in the property were not clear." (*Id.* at 54:16-55:2

6. "All of the items that caused us to put off our negotiations at that time were related to the ongoing litigation. One of those items was related to the disputed copyright. Further, I did not want to become involved in an ongoing litigation related to things that might include more than just a copyright, including methods, means, knowledge of a particular business's practice and other things that might—if there were some kind of ongoing negotiation, if there were some kind of settlement—might obligate them to no longer, make them unable to continue negotiations, if that makes sense." (*Id.* at 60:10-22.)

7. "Q. So you wanted Career Step and the Wilcoxes to go iron out their disputes and then come back to you before resuming negotiations with Ms. Wilcox; is that correct?

   A. That is correct.

   Q. Any other reasons you decided to suspend your negotiations with Ms. Wilcox that we haven't discussed today?

   A. Not that I am aware of." (*Id.* at 62:16-24.)

If Mr. Oldham's statements in his deposition described the current status quo in addition to explaining his understanding at the time in 2006, then at least as of May 1, 2012, Plaintiff's prospective economic relation with Mr. Oldham remained intact, delayed only by the lawsuit that she brought to avoid the terms of the Agreement relating to ownership of the copyright.

In her attempt to show an "improper purpose" or "improper means", Plaintiff also relies on a statement by Mrs. Anaya that Plaintiff was "entirely incompetent to create a medical coding program." (Pl.'s Opp. Mot. Part. Summ. J., 21 [Dkt. No. 232].) Though perhaps impolite, this statement falls far short of a showing that Defendant's "predominant purpose was to injure the plaintiff." *St. Benedict's Dev. Co.*, 811 P.2d at 201; *Leigh Furniture*, 657 P.2d at 307. Not only does this statement fail to show Defendant's "desire to harm" Plaintiff, but it also cannot support an "allegation that defendants' desire to harm" Plaintiff "predominated over their legitimate economic motivations." *St. Benedict's Dev. Co.*, 811 P.2d at 201. Moreover, Mr. Oldham's deposition testimony establishes that Defendant undisputedly did not "threaten, bribe, blackmail,

23

intimidate, or deceive" Mr. Oldham. (Def.'s Reply Mot. Part. Summ. J., 24 [Dkt. No. 239].) And, although allegations of "unfounded litigation" can form the basis for the use of "improper means," the "ongoing litigation" to which Mr. Oldham repeatedly referred in his deposition as the reason for his decision to suspend negotiations with Plaintiff is a dispute about the ownership of the copyright in the Curriculum. The court assumes that Plaintiff does not believe this dispute and the lawsuit she has brought to be "unfounded litigation." Plaintiff's allegations and evidence are not sufficient to create a disputed issue of fact either of an improper purpose or of an improper means under the controlling tests. Plaintiff cannot, therefore, meet the second element of the *Leigh Furniture* test.

As to the third element, Plaintiff mistakenly relies on the damages report supplied by her expert in an attempt to make the necessary showing of damages under the *Leigh Furniture* test. Plaintiff's damages expert specifically notes that "I have been asked to calculate damages relating to the Defendants' alleged copyright infringement and breach of contract." (Nelson Rpt., Ex. AD, 1 [Dkt. No. 232-5].) Aside from the report specifically limiting its calculations to damages resulting from Defendant's alleged breach of the Agreement and copyright infringement, Plaintiff provides no other showing of damages relating to her claim for intentional interference with prospective economic relations.

The summary judgment standard requires the court to enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element to prove that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 323. As Plaintiff has failed to make this showing as to each of the elements of the *Leigh Furniture* test, the court enters summary judgment against Plaintiff on this claim.

G.     **Abuse of Personal Identity**

Plaintiff's allegations and the evidence she has presented about Defendant's alleged abuse of her personal identity under Utah law show "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. Under Utah law, abuse of personal identity occurs where

> (a) an advertisement is published in which the personal identity of that individual is used in a manner which expresses or implies that the individual approves, endorses, has endorsed, or will endorse the specific subject matter of the advertisement; and

> (b) consent has not been obtained for such use from the individual, or if the individual is a minor, then consent of one of the minor's parents or consent of the minor's legally appointed guardian.

Utah Code Ann. § 45-3-3 (2012).

Plaintiff has alleged and Defendant does not dispute that Defendant continued to use marketing and promotional materials including and based on Plaintiff's identity for some time after the alleged termination of the Agreement.[19] The main marketing and promotional materials at issue are an audio CD recording of an introductory letter and the introductory letter itself, both of which Plaintiff created for Defendant's use in marketing the Curriculum as developed by Plaintiff pursuant to the Agreement. Plaintiff alleges that she "revoked her authorization for Career Step to use the Letter and the Audio CD after their professional relationship was terminated." (Pl.'s Opp. Mot. Part. Summ. J., xxxiv ¶ 57 [Dkt. No. 232].) She claims that she effected this revocation both through a communication from her previous counsel in a meeting with Mr. Dunn and other representatives of Defendant in June of 2006 (*id.* at xxxv ¶ 61), and in person later that same day (*id.* at xxxv ¶ 58; 24). Defendant contends that Plaintiff consented to use of the letter and CD and never revoked that consent (Def.'s Mem. Supp. Mot. Summ. J., 38-39

---

[19] The Agreement is silent as to the parties' rights concerning these marketing and promotional materials. (Def.'s Reply Mot. Part. Summ. J., 25 [Dkt. No. 239].)

[Dkt. No. 175]); in fact, Defendant disputes that Plaintiff's previous counsel even attended the June 2006 meeting (Def.'s Reply Mot. Part. Summ. J., 25 [Dkt. No. 239]).

The court agrees that Plaintiff's claim about her previous litigation counsel withdrawing her consent to use the letter and CD at the June 2006, by itself, appears to be a mere conclusory allegation. However, Plaintiff has also provided other evidence from which she argues that a jury could find that Defendant knew that Plaintiff had withdrawn her authorization for Defendant to use these materials. Specifically, Plaintiff provides internal Career Step correspondence to Mrs. Anaya dated August 4, 2008 stating that "[y]ou do not want to know that [Plaintiff's] Hello Friend and [Plaintiff's] CD are still going out in the first mailer packet, so I won't tell you." (*Id.* at xxxv ¶ 61, Email dated Aug. 4, 2008 attached as Ex. Z [Dkt. No. 233-16].) The court believes that this evidence is sufficient to create a genuine dispute of material fact as to whether and when Defendant knew that Plaintiff had revoked or terminated her consent for Defendant to use the letter and CD making specific use of her personal identity.

## CONCLUSION

The court GRANTS Defendant's Motion for Partial Summary Judgment [Dkt. No. 174] in part and DENIES it in part. The court GRANTS Defendant's motion as to Plaintiff's claims for copyright infringement, accounting, fraudulent inducement, and intentional interference with prospective economic relations. The court DENIES the motion as to Plaintiff's claim for abuse of personal identity.

SO ORDERED this 6th day of March, 2013.

BY THE COURT:

Clark Waddoups
United States District Judge

26